1    presence of the ladies and gentlemen of the jury.

2         Ladies and gentlemen, I am well aware of the fact that

3    it's pretty warm in here and it has been for sometime.  I have

4    made numerous requests -- you have to understand the federal

5    courts are tenants of this building, if you can believe it.  We

6    pay rent to the general service administration, which is

7    another part of the federal government.  And I can assure you

8    we pay a lot of rent.  Much more than we should.  And

9    unfortunately the air conditioning and the maintenance of it is

10   something that GSA has to handle not us we don't have control

11   over it.

12        Now, I've made numerous requests over the last 3 weeks

13   as my courtroom manager will attest to, and we've got very

14   little result all we get is a lot of lip service about how

15   they've done the best they can.  Well, it isn't good enough.

16   So I just gave them a real piece of my mind and they are now

17   going to be coming up here this afternoon to theoretically work

18   on it which means they need access to the courtroom.

19        What we're going to try to do now is to finish up this

20   witness and then I'm going to release you for the afternoon so

21   they can have access to here and also give you some relief

22   because I know many of you are quite uncomfortable.

23        I can tell you, as I told the counsel, and they're

24   suffering as well, that I'm a little bit higher than you are

25   and you know hot air rises and I'm up here with you know, a

1    long sleeve shirt a tie and I'm wearing this very heavy

2    polyester robe and any of you who wear polyester or heavy

3    polyester know it can get quite warm.  Polyester is not a

4    really good fabric for keeping you cool.  I don't know why they

5    don't make these things in cotton, but they make them in

6    polyester.

7           So that is where we are we're going to go ahead finish

8    up this witness as soon as we're done that'll be it for the

9    afternoon okay?  Thank you.

10          You want to proceed?

11          And, ma'am, I would remind you that you remain under

12   oath.

13          THE WITNESS:  Yes.

14   BY MR. GOYA:

15   Q    Ms. Walters, I believe where we left off was the issuance

16   of checks and what I'll go into now is the procedures that are

17   involved once the check is issued.  Are you familiar with the

18   procedures that your branch follows once a check is issued?

19   A    Yes.  Yes.

20   Q    And could you tell us what procedures those are?

21   A    Once the checks are printed over -- in the overnight

22   processing, the clerical staff retrieves the checks from the

23   ICSD division and start working on it.  We reconcile, we look

24   at the -- the checks come out in routing versus mailing, and we

25   process those checks by folding them and scanning g to make

1    sure everything is okay.

2            The routing, we route to the department or we put it

3    for pick up or in the mailing we have the courier take it to

4    the post office.

5    Q    All right.  Now you mentioned a section, I think it was

6    ICSD.  Can you explain what that is?

7    A    It's the information and communication division --

8    services division.  They're responsible for running the State

9    FAMIS accounting system, which is part of the whole process of

10   issuing the checks.

11   Q    All right.  Now, in terms of the delivery of the checks

12   once they're issued, how do your collection know how the checks

13   should go to the businesses?

14   A    The department will code the summary warrant voucher with

15   a one.  There's a WR one and they will code it one which means

16   warrant routing indicator one, which means return to the

17   department.  If the WRI one is blank, then it's mailed.

18   Q    All right.  Now, what I will be showing you, Ms. Walters

19   is a, again, an image of the summary warrant voucher and I

20   believe it's Exhibit 4J.

21           MR. GOYA:  And if we could have the upper portion of

22   that document enlarged, please.

23   BY MR. GOYA:

24   Q    Now, you indicated that the warrant routing indicator

25   would be the thing that your clerks would look at to determine

1    whether to mail a check or whether to send it back to the

2    originating agency; is that correct?

3    A    Yes.

4    Q    All right.  Now, where would that warrant routing

5    indicator appear?

6    A    It's the fourth line down after batch reference number,

7    it's the WRI.

8    Q    Okay.  Now, is it where I'm pointing with the laser --

9    A    Yes.

10    Q    -- pointer?

11    A    Yes.

12    Q    Okay.  Now, in this instance it appears that the warrant

13    routing indicator is blank?

14    A    Yes.

15    Q    And that means that in terms of the checks that would be

16    listed on this document, how would they be delivered to the

17    businesses?

18          MR. LUKE:  Well, objection, Your Honor.  Lack of

19    foundation, calls for speculation and hearsay.

20          THE COURT:  Well, I -- there's a lack of foundation

21    for the question.  I think if you put the right foundation

22    there I think she can answer the question.

23          MR. GOYA:  All right.

24    BY MR. GOYA:

25    Q    Now, Ms. Walters, are you familiar with the procedure

```
 1    involved in the filling out of the various fields that are

 2    involved with a summary warrant voucher?

 3    A    Yes.

 4    Q    And how are you familiar with that?

 5    A    I -- I also -- I'm responsible for generating a very small

 6    amount of summary warrant vouchers.

 7    Q    And you're also responsible for reviewing these documents

 8    from time to time?

 9             MR. LUKE:  Objection, Your Honor, leading and it's

10    argumentative.  He's testifying.

11             THE COURT:  Sustained.  It's leading.

12    BY MR. GOYA:

13    Q    Do you have any personal involvement in -- in dealing with

14    any of these documents, summary warrant vouchers?

15    A    Yes.

16    Q    And what would your involvement be?

17    A    I -- I'm responsible for, in some cases to generate these,

18    summary warrant vouchers.  My section if they have a question

19    or point about a voucher payment, the supervisor will bring it

20    to my attention.

21    Q    All right.  And in terms of the warrant routing indicator,

22    have you received instruction concerning how that field should

23    be dealt with?

24    A    In the FAMIS system, a blank is mail, one is route.

25    Q    All right.  Now, in terms of, again, the various checks
```

1    that are indicated on this summary warrant voucher, and we're

2    looking at Government's Exhibit 4J, how would those checks have

3    been delivered to the businesses?

4             MR. LUKE:  Objection.  Lack of foundation, calls for

5    speculation.

6             THE COURT:  Overruled.

7    BY MR. GOYA:

8    Q    How would those checks have been delivered to those

9    businesses?

10   A    Mailed.

11   Q    Now, with regard to other checks, prior to appearing in

12   court did I ask you to review certain checks that I gave to you

13   to determine how those checks were delivered to the applicable

14   businesses?

15   A    Yes.

16   Q    And just to be clear, what I'll do is give you a list of

17   the checks that I did give to you?

18   A    Can I look at --

19   Q    All right.  They would be Government's Exhibits 2 L

20   through 8 L.

21   A    Should I look at my -- can I look at my documents?

22            MR. LUKE:  I'm sorry, Mr. -- I missed that, two L.

23            THE COURT:  Through eight L.

24            MR. LUKE:  Two eight L.

25            THE COURT:  No, two L through eight L.

1          MR. LUKE:  Oh, thank you very much.  Thank you.

2          THE WITNESS:  Is it okay I separate it out?

3          THE COURT:  Yes.

4                    (Pause in the proceedings.)

5          THE COURT:  I think next time it might be helpful to

6   have the witness look at them before you call them to the stand

7   so we don't waste time.

8          MR. GOYA:  Yes, Your Honor, I attempted to do that.

9                    (Pause in the proceedings.)

10         THE WITNESS:  So I got two, three, four, five, six,

11  seven, eight.  I got 'em.  I have the documents.

12  BY MR. GOYA:

13  Q    Okay.  Just so that we're clear, the only thing that I'm

14  asking you about is whether I gave you a set of checks?

15  A    Yes, you did.

16  Q    Okay.  And that the checks are by Exhibit Number 2 L,

17  three L, four L, five L, six L, seven L, and eight L?

18  A    Yes.

19  Q    Okay.  And they also include nine K, ten L --

20  A    I didn't pull -- whatever you said you gave me, I have it

21  here, but it's like I did it chronological instead of exhibit

22  because I'm an accountant, so...

23  Q    Okay.  Would you prefer then --

24         THE COURT:  We'll forgive you for that.

25  BY MR. GOYA:

1    Q    So would you prefer me going through each exhibit just so

2    that you can verify for yourself that you in fact did get that

3    check?

4    A    If I -- I'm sure it's in here and I've reviewed it several

5    times and I would say I'm positive it's in here, you know.

6            THE COURT:  All right.  All right.  That's her answer,

7    I think.

8    BY MR. GOYA:

9    Q    Okay.  And just for the record --

10           THE COURT:  Mr. Tong, did you want to talk to your

11   co-counsel?

12           MR. TONG:  May I have one --

13           THE COURT:  Yeah.

14                   (Counsel conferring.)

15   BY MR. GOYA:

16   Q    All right.  We'll try again.  Okay.  First off, what I'll

17   do is read you information about the check and ask you if you

18   have a copy of that.

19   A    Okay.

20   Q    Okay.  First one is two L, this is a check that's dated

21   June 17th -- excuse me, July 17th, 1999.  And it was to Argent

22   Construction.

23   A    The check is dated July 16th?

24   Q    Yes.

25   A    Yes.

1  Q    Okay.  And does it have a label on it saying Government's

2  Exhibit 2 L?

3  A    Yes.

4  Q    Okay.  We'll move on to three L.  This is a check dated

5  July 16th, 1999 and it was made out to Gothic Builders.

6  A    Yes.

7  Q    Four L is a check that's dated July 30th, 1999 made out to

8  Argent Construction.

9  A    Argent Construction, yes.

10  Q    Five L is a check dated August 2nd, 1999 made out to

11  Gothic Builders.

12  A    August 2nd, Gothic Builders.

13  Q    Six L is a check dated August 2nd, 1999 made out to Argent

14  Construction?

15  A    Yes.

16  Q    Seven L is a check dated August 4th, 1999 made out to the

17  KenLee LLC?

18  A    August 4th, KenLee LLC.

19  Q    Eight -- eight L is a check dated August 4th, 1999 made

20  out to Argent Construction?

21  A    Yes.

22  Q    Nine K is a check made out -- excuse me, dated August 5th,

23  1999 made out to MF Masonry?

24  A    Excuse me, I didn't -- I thought we were going only up to

25  eight.

```
 1                   (Pause in the proceedings.)
 2              THE COURT:  Mr. Goya, this is not --
 3              THE WITNESS:  Nine and ten.
 4              THE COURT:  Did you find it finally?
 5              THE WITNESS:  Yeah, I got nine and ten.
 6              THE COURT:  Go on.
 7              MR. GOYA:  All right.
 8   BY MR. GOYA:
 9   Q    So again that was nine K?
10   A    Yes.
11   Q    And it was a check dated August 5th, 1999 to MF Masonry?
12   A    Yes.
13   Q    Ten L, a check dated August 5th, 1999 to Gothic Builders?
14   A    Yes.
15   Q    11 L, a check dated August 6, 1999 to MF Masonry?
16   A    August 6th, MF Masonry.
17   Q    And 12 J, a check dated August 6, 1999 to the KenLee LLC?
18   A    Yes.
19   Q    13 J, a check dated August 6, 1999 to, again, the KenLee
20   LLC?
21   A    Yes.
22   Q    14 L, a check dated August 6, 1999 made out to Argent
23   Construction?
24   A    Yes.
25   Q    A check dated -- excuse me, a check -- 15 L, dated
```

1   August 9th, 1999 made out to Argent Construction?

2   A    August 9th, Argent Construction.

3   Q    And 16 L, a check dated August 10th, 1999 to MF Masonry?

4   A    August 10th, MF Masonry.

5   Q    A check, 17 L, dated August 10th, 1999 made out to MF

6   Masonry?

7   A    17 J -- I mean 17 --

8   Q    17 L.

9   A    8/10, MF Masonry.

10   Q    Yes.  18 L, a check dated August 16th, 1999 made out to MF

11   Masonry?

12   A    Yes.

13   Q    19 L, a check dated August 18th, 1999 to MF Masonry?

14   A    August 18th, MF Masonry.

15   Q    20 L, a check made out to Hammer Jammers the date on that

16   being July 1st, 1999?

17   A    7/1, Hammer Jammers.

18   Q    Yes.  21 K, a check dated July 16th, 1999 made out to Wes'

19   Contracting?

20   A    21.  7/16, Wes' contracting.

21   Q    22 K, a check dated July 16th, 1999 made out to Hammer

22   Jammers?

23   A    Yeah, 7/16, Hammer Jammers.

24   Q    23 L, a check dated July 16th, 1999 made out to Wes'

25   contracting?

1    A    Yes.

2    Q    24 L, a check dated July 30th, 1999 made out to Hammer

3    Jammers?

4    A    Yes.

5    Q    25 L, a check dated July 30th, 1999 made out to Wes'

6    Contracting?

7    A    Yes.

8    Q    26 L, a check dated July 30th, 1999 made out to Hammer

9    Jammers?

10    A    26?  26.  7/30, Hammer Jammers.

11    Q    Okay.  27 L, a check dated July 30th, 1999 made out to

12    Wes' Contracting?

13    A    7/30, yes.

14    Q    28 L, a check dated August 2nd, 1999 made out to Wes'

15    Contracting?

16    A    8/two, Wes' Contracting.

17    Q    29 L, a check dated August 2nd, 1999 made out to Hammer

18    Jammers?

19    A    Yes.

20    Q    30 L, a check dated August 4th, 1999 mated out to Wes'

21    Contracting?

22    A    Yes.

23    Q    31 K, a check dated August 5th, 1999 made out to Hammer

24    Jammers?

25         MR. ISHIBASHI:  Your Honor, may I ask what is the

1    purpose of what we are doing at this stage --

2              THE COURT:  I have no idea.

3              MR. ISHIBASHI:  -- regarding these checks?

4              THE COURT:  An I'd like to know myself.  So thank you

5    for asking.

6              MR. GOYA:  Well, Your Honor --

7              THE COURT:  What are you doing?

8              MR. GOYA:  What I'm attempting to do is have her

9    confirm that I did give her checks that I did ask her to

10   verify --

11             THE COURT:  Why can't we just have a -- why wasn't

12   there just a list of checks and all she had to do was flip

13   threw the checks she didn't have to go through tons of paper.

14             MR. GOYA:  I understand, Your Honor.

15             THE COURT:  This is just an absolute waste of the

16   jury's time and the court's time and counsel's time.

17             THE WITNESS:  You're saying 31?

18   BY MR. GOYA:

19   Q    31 K.

20   A    8/5, Hammer Jammers.

21   Q    32 L, check dated August 5th, 1999 to Wes' Contracting?

22   A    Yes.

23   Q    33 L, a check dated August 6, 1999 to Wes' Contracting?

24   A    Yes.

25   Q    A check 34 K dated March 2nd, 1999 to MF Masonry?

```
1    A    March 2nd, MF Masonry.

2    Q    35 K, a check dated March 9th, 1999 to Gothic Builders?

3    A    March 9th, Gothic Builders.

4    Q    36 K, a check dated March 3rd, 1999 to Argent

5    Construction?

6    A    Yes.

7    Q    A check 36 K dated May 11th, 1999 to MF Masonry?

8    A    37 K?  May 11th, MF Masonry.

9    Q    Okay.  38 J, a check dated April 1st, 1999 to Argent

10   Construction?

11   A    April 1st, Argent Construction.

12   Q    40 K, a check dated June 18th, 1999 to Hammer Jammers?

13   A    40 K.  June 18th, Hammer Jammers.

14   Q    41 K, a check dated May 21st, 1999 to Gothic -- Gothic

15   Builders?

16   A    21st, Gothic Builders.

17   Q    42 K, a check dated June 1st, 1999 to Wes' Contracting?

18   A    June 1st, Wes' Contracting.

19   Q    43 K, a check dated May 11th, 1999 to Gothic Builders?

20   A    May 11th, Gothic Builders.

21   Q    44 K, a check dated June 23rd, 1999 to Hammer Jammers?

22   A    June 23rd, Hammer Jammers.

23   Q    45 K, a check dated May 21st, 1999 to Hammer Jammers?

24   A    5/21, Hammer Jammers.

25   Q    And 46 J, a check dated August 17th, 1999 to Wes'
```

1    Contracting?

2    A    August 17th, Wes' Contracting.

3    Q    All right.  Now, those checks that we just went through,

4    Mrs. Walters, did I ask you to go through the applicable

5    summary warrant vouchers and determine whether in fact those

6    checks were mailed or somehow otherwise delivered to the

7    businesses?

8         MR. ISHIBASHI:  Your Honor, I'm going to object to the

9    form of the question.  Counsel has placed himself as a witness

10   in this exchange here and I object to that.

11        THE COURT:  Well, I don't think he's a witness.  He's

12   handed over something to the witness and that doesn't make him

13   a witness.  So, unless there's some dispute as to whether he

14   did it.  And I don't believe there is.  So, I'll overrule the

15   objection.

16   BY MR. GOYA:

17   Q    All right.  Mrs. Walters, the question is:  Did you do

18   anything to determine how those checks that we just went

19   through were delivered to the businesses?

20   A    Based on what you gave me, I retrieved the records from

21   records center, which is to -- I had to look at the report 100

22   to determine whether it was mailed or routed.

23   Q    Okay.  Now, you mentioned that there was an additional

24   document, something called a warrant -- excuse me, something

25   called a report 100?

1    A    Yes.

2    Q    Could you explain what that is?

3    A    The report 100 is the equivalent to report 106.  Report

4    106, which is the summary warrant listing is given to the

5    departments to notify the departments that we have issued the

6    checks, check number and check date.  The report 100 is

7    retained by DAGS preaudit and we note on the report whether it

8    was mailed or routed.

9    Q    All right.  Now, those reports that you just mentioned,

10   those are reports that are created by personnel in your branch

11   in the ordinary course of their duties with your branch?

12   A    It gets generated by the FAMIS system, the -- the

13   accounting system, yes.

14   Q    Okay.  And are those records also maintained in the

15   ordinary course of your branch's business activities?

16   A    Yes.

17   Q    Now, if I could have you take a look at the binder that's

18   in front of you.  All right.  Now, there's a tab on one of the

19   documents and it says Government Exhibit 68.  Okay.  And are

20   those copies of the report 100s that you collected for the

21   purpose of verifying how checks were delivered with respect to

22   the exhibit numbers that we just went through?

23              MR. LUKE:  Well, objection, Your Honor.  It's leading.

24              THE COURT:  Sustained.

25   BY MR. GOYA:

43

1   Q    All right.  The report -- the documents in front of you,

2   the Exhibit 68?

3   A    Yes.

4   Q    What are those?

5   A    Those are report 100s, copies of the report 100s.

6   Q    And how do they relate to the checks that we just -- you

7   just testified about?

8   A    We notate whether we mail or route the checks back to the

9   department on the lower left-hand corner.

10  Q    All right.

11          MR. GOYA:  Your Honor, at this time I'd like to move

12  Exhibit 68 into evidence.

13          THE COURT:  It'll be --

14          MR. LUKE:  I object on lack of foundation and lack of

15  personal knowledge calls for speculation.

16          THE COURT:  All right.  The objection is overruled.

17  It'll be received.

18      (Government's Exhibit 68 was received in evidence.)

19  BY MR. GOYA:

20  Q    What I'd like to do is direct your attention again to the

21  screen and what we'll be looking at would be a document that's

22  been Bates stamped 40 as part of Government Exhibit 68.

23          All right.  Now, first of all do you recognize what

24  this is?

25  A    That's the report 100.

44

1   Q    Now, there's a there's a header here that says report 100.

2   Is this the document?

3   A    Yes.

4   Q    And there are numbers that appear below that, department

5   voucher number and comptroller voucher number?

6   A    Yes.

7   Q    How do they relate to the other documents that you

8   testified about earlier?

9   A    They're the summary warrant voucher that authorized the

10  issuance of the checks listed on report 100.

11  Q    All right.  Now, the one business that we focused on

12  earlier in your testimony was Argent Construction; is that

13  correct?

14  A    Yes.

15  Q    And does that business appear on this listing?

16  A    Yes.

17  Q    And is it where I'm now pointing with a laser pointer?

18  A    Yes.

19  Q    Okay.  Now, first beginning with the first heading, could

20  you explain what that would be?

21  A    The payee slash line number is the -- is the -- who the

22  check was issued to.  And it's issued to vendor number three

23  which is Argent Construction.

24        MR. LUKE:  I'm sorry to interrupt.  May I have

25  identification by the Bates stamp page number.

```
 1              MR. GOYA:  40.

 2              MR. LUKE:  Excuse me?

 3              MR. GOYA:  40.

 4              MR. LUKE:  Oh, 40.  Thank you.

 5     BY MR. GOYA:

 6     Q     All right and the next column heading is?

 7     A     The purchase order number.

 8     Q     And that would relate to?

 9     A     The purchase order that was issued that authorized the

10     services or goods to be performed by Argent Construction.

11     Q     And that would be this number here (indicating)?

12     A     Yes.

13     Q     And the last column -- excuse me, the second to the last

14     column, what would that be?

15     A     That would be the amount paid to Argent Construction.

16     Q     And in this case it was how much?

17     A     $8,859.

18     Q     And the last heading is?

19     A     Warrant number, which is the check number.

20     Q     All right.

21              MR. GOYA:  Now, if we could scroll down a little

22     further in the document.

23     BY MR. GOYA:

24     Q     Now, you indicate to us that in some way there is an

25     indication of how the check should be delivered to the
```

1    business?

2    A    Yes.

3    Q    And could you explain to us how exactly or what part of

4    this document would indicate that?

5    A    The lower left-hand corner.  When we mail --

6    Q    Okay.  First of all, is it where I'm pointing with the

7    laser pointer?

8    A    Yes that's the clerk -- clerk's initials who worked on the

9    batch of checks.

10   Q    All right.  Now, does one block that is headed by the

11   word?

12   A    "By."

13   Q    And below that is someone's initials?

14   A    C S.

15   Q    And that would be one of your employees?

16   A    Yes.

17   Q    The next block is headed?

18   A    "Date."

19   Q    And what is below that?

20   A    August 2nd.

21   Q    And that would indicate exactly what?

22   A    The date we worked and mailed.

23   Q    Now, over on the left-hand corner, there are 2 words, what

24   do those signify?

25   A    Mail dash D E L we either mail or deliver our procedure is

1    if we either mail or deliver we put the slash through the word.

2    Q    All right.  So in this particular case how were the checks

3    on this document delivered?

4    A    Mailed.

5         MR. LUKE:  Objection, Your Honor.  Lacks foundation,

6    calls for speculation.

7         THE COURT:  Overruled.

8    BY MR. GOYA:

9    Q    Now, Ms. Walters, did I ask you to follow the same

10    procedure with regard to the other checks that we went through

11    earlier?

12    A    Yes.

13    Q    And what did you do to try to accomplish what I asked of

14    you?

15    A    We went down to records center and made copies of the

16    pertinent report 100s to confirm that all were mailed.

17    Q    All right.  And with respect to the checks that I showed

18    you -- gave to you earlier or gave you prior to court, did you

19    go through each report 100 and try to pair it up with the

20    corresponding check?

21    A    Yes.

22    Q    And when you did that, what did you find?

23    A    All the checks were mailed.

24    Q    Now, when you say all the checks were mailed, was that

25    through the United States mail?

1    A    Yes.

2          MR. GOYA:  Your Honor, I believe I'm done with my

3    examination.

4          THE COURT:  All right.

5                      CROSS-EXAMINATION

6    BY MR. LUKE:

7    Q    Good afternoon, Ms. Walters.  Please bear with me.  I know

8    it's warm, but at least you'll be done and you won't be coming

9    back tomorrow, possibly.

10          Ma'am, the -- you testified that in the capacity that

11   you hold as preaudit branch chief; is that correct?

12   A    Yes.

13   Q    State of Hawaii.  That you -- you are responsible for --

14   you indicated a small amount of routing, personally responsible

15   for a small amount of routing.  Do you recall saying that,

16   testifying to that?

17   A    I didn't say routing, I said generating the summary

18   warrant vouchers.

19   Q    Okay.  So you're responsible for generating a small amount

20   of the?

21   A    Summary vouchers.

22   Q    Summary warrant vouchers, right?

23   A    Yes.

24   Q    Okay.  So as far as your responsibilities are concerned,

25   you're familiar with what goes on within the area of your

1    supervision, correct?

2    A     Yes.

3    Q     The rest of your testimony has to do with your

4    understanding of the procedures that are generally followed

5    with respect to DAGS and the handling of the summary warrant

6    vouchers?

7    A     Excuse me, I -- could you --

8    Q     Okay.  I'm sorry if I didn't make myself clear.

9          The rest of your testimony pertaining to how these

10   summary warrant vouchers are handled and how the checks are

11   disseminated has to do with your understanding of the

12   procedures that are generally followed; is that correct?

13   A     These are the procedures followed.

14   Q     Okay.  You don't have any personal knowledge of whether or

15   not the checks were in fact mailed, do you?

16   A     Our established procedures are followed to the letter.  So

17   if it's marked mailed, we mail.

18   Q     Well, no I understand what the procedures are I think

19   you've testified.  My question is:  You don't have any personal

20   knowledge as to how --

21          MR. GOYA:  Arguing with the witness, Your Honor.

22          MR. LUKE:  Just personal knowledge, Your Honor.  I'm

23   not -- I don't mean to argue.  I'm not trying to argue.

24          THE COURT:  All right.  Well, let her answer the

25   question.

1    BY MR. LUKE:

2    Q    You don't have any personal knowledge, do you, ma'am?

3    A    No.

4    Q    Okay.  Your answer is no?

5    A    No -- yes.

6    Q    Okay.  Now, the when the decision is made to mail or to

7    deliver, this is done by the government, whether it's by DAGS

8    or the agency within the State of Hawaii that handles these

9    mailings; is that correct?

10        MR. GOYA:  Your Honor, I think that misstates the

11   testimony of Ms. Walters.

12        THE COURT:  Sustained.

13   BY MR. LUKE:

14   Q    All right.  Well, the mailing is done by the government,

15   isn't it?

16   A    We mail the checks.

17   Q    Right.

18   A    On -- on what the department tells us to do.

19   Q    All right.  What department is that again?

20   A    Department of Transportation.

21   Q    Okay.  So the Department of Transportation, which is an

22   agency of the government, tells you what to do; is that

23   correct?

24   A    On their vendor payments, yes.

25   Q    Okay.  And that extends to whether or not it should be

```
 1    mailed or whether it should be routed by -- or delivered by

 2    other means?

 3    A     Routed or mailed, yes.

 4    Q     The answer is yes?

 5    A     Yes.

 6    Q     The vendors do not request how the -- the checks are to be

 7    delivered to them; isn't that true?

 8              MR. GOYA:  Beyond the scope, Your Honor.

 9              THE COURT:  Sustained.

10    BY MR. LUKE:

11    Q     It's exclusively within the purview of the government, the

12    responsibility of the government to decide how these checks are

13    mailed, right?

14    A     How the checks are delivered to the vendor, yes.

15    Q     Yes I'm just distinguishing the government from the

16    vendors themselves that's all I'm asking you.  Right?

17    A     The government determines.

18    Q     Okay.  Now, you you were answering questions in response

19    to Mr. Goya, he asked you and I'm not going to have you go

20    through it again, with respect to the checks themselves the one

21    you took time to find locate and respond affirmatively.  The

22    question was put to you:  Is this a check?  You recall that

23    question, to which you answered:  Yes; is that right?

24    A     Yes.

25    Q     Right, ma'am?
```

1    A    Yes.

2    Q    Are those original checks that you have before you?

3              MR. GOYA:  Irrelevant, Your Honor.

4              MR. LUKE:  It's not irrelevant, Your Honor, it's a

5    matter of the foundation.

6              THE COURT:  The objection is sustained.

7              MR. LUKE:  Your Honor, if it -- if it is --

8              THE COURT:  Objection is sustained.

9    BY MR. LUKE:

10   Q    Now, the -- do you have any of those checks in front of

11   you, ma'am, as you sit there today?  Do you have any of those

12   checks, the ones requested of you, do you have one that's

13   really handy that I could look at?  Is that possible?

14   A    No.

15   Q    I mean the ones you just looked at in response to Mr.

16   Goya, do you have one on the witness stand as you sit there?

17   A    Oh, the copy.

18   Q    Yes.

19             MR. LUKE:  May I just approach, Your Honor, briefly?

20             THE COURT:  Yes.

21   BY MR. LUKE:

22   Q    And just as an example, I guess this is 46 J, this is not

23   a check itself, it's a copy of a check isn't it?

24   A    Yes.

25             MR. GOYA:  Your Honor, this seems to be irrelevant.

1   There was a stipulation as to the authenticity of the check.

2   So, I -- I believe that this isn't fertile ground for

3   questioning.

4           THE COURT:  Yeah, the court agrees there is no issue

5   as to the authenticity of the checks.

6   BY MR. LUKE:

7   Q    Well, the testimony you have provided this afternoon,

8   Ms. Walters, with regard to the -- the default, if there is

9   a -- if a WR, the warrant routing indicator has a one, then the

10   warrant check is delivered by messenger back to the procurement

11   department; is that correct?

12   A    Yes.

13   Q    Okay.  Now, it's true that depending on instructions from

14   the procuring department, the checks are either routed back to

15   the procuring department or mailed to the vendor through the

16   United States mail is that what you're saying?

17   A    I didn't --

18   Q    If there's a blank then supposedly it is supposed to be

19   mailed, right?

20   A    Mailed.

21   Q    And in fact, the -- that's part of what they call the

22   default for the -- for the routing of the check?

23   A    Yes.

24   Q    Okay.  Now, if it is blank, the warrant check should be

25   mailed to the vendor; is that correct?

1    A    Yes.

2    Q    Occasionally a department may call up DAGS and put in a

3    special request to have a warrant check that would have been

4    mailed held for delivery back to the department?

5            MR. GOYA:  Beyond the scope, Your Honor.

6            MR. LUKE:  Well, it has to do with the mailings, Your

7    Honor.

8            THE COURT:  Overruled.

9    BY MR. LUKE:

10    Q    You follow me, ma'am, Mrs. Walters?

11    A    Are you saying that if it was left blank it could somehow

12    be delivered?

13    Q    Yeah, occasionally my question was occasionally a

14    department will call up DAGS, the Department of Accounting and

15    General Services and put in a special request to have a warrant

16    check that would have otherwise been mailed held for delivery

17    back to the department, correct?

18    A    Yes.

19    Q    Okay.  Now, admittedly that practice is quite rare,

20    correct?

21    A    Yes.

22    Q    That practice may also be discouraged, right?

23    A    Strongly discouraged.

24    Q    Okay.  But you testified that if the warrant routing

25    indicator was blank, that means that the warrant check was

1    mailed to the vendor, you testified to that?

2    A    Yes.

3    Q    Isn't it true that that's not always the case, though?

4    Occasionally the warrant routing indicator may be blank but the

5    warrant check is not mailed back to the vendor; isn't that

6    true, ma'am, on occasion?

7    A    On occasion, but we would notate that even though it was

8    blank, it was released to the department and the date and who

9    we released it to.  So if it was actually supposed to have been

10   mailed but was routed, we would so notate on the bottom.  If

11   the top is blank and the department requests, you know, we

12   would notate that it was released to the department on what

13   date.

14        THE COURT:  Are there any notations of that kind on

15   any of the checks that you've --

16        THE WITNESS:  No.

17   BY MR. LUKE:

18   Q    All right.  Now that's a practice that you follow in your

19   department, right?

20        MR. GOYA:  Argumentative, Your Honor.

21        THE COURT:  Sustained.

22   BY MR. LUKE:

23   Q    You don't have personal knowledge whether that in fact is

24   true --

25        MR. GOYA:  Asked and answered, Your Honor.

1          MR. LUKE:  Well --

2          THE COURT:  She's already answered the question.

3   Sustained.

4   BY MR. LUKE:

5   Q    Now, the report 100 whether the -- which indicates whether

6   the warrant was mailed or held for delivery, there's a listing

7   of warrant numbers processed by the department; is that

8   correct?

9   A    The department processes the summary warrant vouchers.

10  Q    Right.

11  A    They have no control over the checks and the check

12  number -- I mean the check numbers.

13  Q    Okay.  Are there report 100s or report 106s available for

14  all those checks that you have in front of you that you

15  responded to for Mr. Goya?

16  A    Yes.

17  Q    You didn't see them, though, did you?

18  A    I reviewed the -- the documents marked as evidence that he

19  had gave -- given me.

20  Q    And those are the report 100s, 106s?

21  A    The 106s.  I retrieved the 100s to make sure that, you

22  know, I know it was mailed.

23  Q    All right.  Now, the report 100s, you don't know who

24  actually prepare those, do you?

25          MR. GOYA:  Argumentative, Your Honor.

1          THE COURT:  No, it's not argumentative.  The objection

2     is overruled.

3     BY MR. LUKE:

4     Q    You don't know who prepares the report 100s, do you,

5     ma'am?

6     A    The system is -- the system -- the accounting system is

7     responsible for generating based on the summary warrant

8     vouchers that got released into the accounting system.

9     Q    Well, I --

10    A    So I would say the system based on what was input, you

11    know, generated the checks.

12    Q    This is your understanding as what's supposed to happen

13    right?

14    A    Yes.

15          MR. GOYA:  Argumentative, Your Honor.

16          THE COURT:  No it's not argumentative.  Overruled.

17          MR. LUKE:  Thank you, Your Honor.

18    BY MR. LUKE:

19    Q    But, Ms. Walters, all I'm asking is that you don't know --

20    I mean I know how the system -- we all understand how the

21    system is supposed to work I think you testified but you don't

22    have personal knowledge in each case the system worked in that

23    way, do you?

24          MR. GOYA:  Seems to be asked and answered, Your Honor.

25          THE COURT:  No, now this is argumentative.  You were

1   better with the earlier objection.  Sustained.

2           MR. LUKE:  All right.  Okay.

3   BY MR. LUKE:

4   Q    Just a couple more questions, ma'am.  I mean I better

5   watch out when I make those statements.  Just a few more

6   questions.

7           You testified that in your section your supervisor

8   would bring to your attention how -- and maybe I

9   misunderstood -- how the summary warrant vouchers were routed,

10  or did I misunderstand that?

11  A    Oh, that was in regard to another section.  If they had

12  questions on the voucher, if the -- usually if a department has

13  a request, you know, I might -- my desk is right out the door

14  and, you know, it's, like it was stated, it's a very rare case

15  where we strongly discourage changing what was already on the

16  document.

17  Q    All right.  But despite the fact that it's very rare and

18  despite the fact that it is strongly discouraged, nevertheless,

19  sometimes it happens, right?

20  A    It would be so notated on the report 100.

21          MR. GOYA:  Objection, Your Honor.

22          THE COURT:  She's answered the question.

23          MR. LUKE:  Nothing further.

24          THE COURT:  All right.  Nothing else?  All right.

25          MR. GOYA:  No further redirect, Your Honor.

1          THE COURT:  All right, ma'am, you may step down.

2    Thank you.  Please watch your step.  That sharp thing -- you

3    can just leave the papers there.

4                                        (Witness excused)

5          THE COURT:  All right ladies and gentlemen it's really

6    getting hot here again.  So please just be in the jury lounge

7    tomorrow morning, hopefully GSA will have done something.  I

8    can't guarantee anything.  But hopefully they will have done

9    something over the evening.  And we will see you try to bring

10   you up about 9 o'clock so be there about, you know, 8:45 as

11   usual.

12         Have a good evening.  Thank you very much for your

13   attention today.

14

15

16

17

18

19

20

21

22

23

24

25